# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00161-CR
## NO. 03-20-00162-CR

---

**Curtis A. Fenderson, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 426TH DISTRICT COURT OF BELL COUNTY**
**NOS. 79021 & 79022, THE HONORABLE FANCY H. JEZEK, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Following a bench trial, the district court convicted appellant Curtis Fenderson of the offenses of taking a weapon from a peace officer, *see* Tex. Penal Code § 38.14(b), and assault on a public servant, *see id*. § 22.01(a)(1), (b-2). Fenderson pleaded true to enhancement paragraphs alleging two prior felony convictions, and the district court sentenced him to 25 years' imprisonment for each offense, with the sentences to run concurrently. In two issues on appeal, Fenderson asserts that the evidence is insufficient to support each of his convictions. We will affirm the judgment of conviction for the offense of taking a weapon from a peace officer. We will modify the judgment of conviction for the offense of assault on a public servant and affirm the judgment of conviction as modified.

BACKGROUND

At trial, the district court heard evidence that on the night of June 5, 2018, Officer Franklin Melendez of the Killeen Police Department initiated a traffic stop on a vehicle. The driver of the vehicle, later identified as Fenderson, did not have his driver's license or proof of insurance on him and gave the officer a fictitious name, Remo Noble, and two different dates of birth. Melendez and another officer, Michael Swan, ran multiple computer searches on the information provided and were unable to find anyone with that name, so Melendez prepared to arrest Fenderson for the offense of failure to identify and asked him to step out of the vehicle. Fenderson exited the vehicle and immediately ran away, pushing past Melendez as he did so. Melendez, Swan, and a third officer, Christopher Ache, chased after him.

Swan used a stun gun on Fenderson, specifically a TASER-brand conducted electrical weapon ("Taser"), causing Fenderson to stumble and enabling Ache to take him to the ground. Ache fell to the ground with Fenderson, and a struggle ensued between the officers and Fenderson, with the officers attempting to subdue and arrest Fenderson and Fenderson resisting their attempts. Melendez testified that Fenderson tried to stand up, refused to "provid[e] his hands" to the officers, and was "actively striking" them. Melendez added that Fenderson hit him in the head. Ache recounted, "We're in a fight with [Fenderson] trying to get him detained. He kept pushing us off. And one time he took a swing at me but missed so I pinned his arm on the ground."

Swan handed his Taser to Ache because Ache's Taser "came off [his] body" during the scuffle. As Ache prepared to use Swan's Taser on Fenderson, "it got knocked out of his hand" by Fenderson. More specifically, Ache testified that in his offense report, he wrote that Fenderson "swung his arm and hit the Taser out of [his] hands." Ache further testified that

2

he had "no idea" where the Taser went after it was knocked away from him but that he believed "[i]t went into the grass somewhere to the side as [] we were fighting."

At some point during the scrum, Fenderson gained possession of the Taser that Swan handed to Ache, although the officers did not know how. Ache testified that he never saw the Taser again after it was knocked away from him, but he heard Melendez yell that Fenderson "had the Taser and was trying to tase" Melendez. Swan testified, "I'm not sure how [the Taser] gets loose, honestly, but I know it gets loose and ends up in Mr. Fenderson's hands." Melendez testified that he saw Fenderson holding the Taser, with his finger on the trigger, as he was about to activate it. Fenderson tased Melendez's arm, causing him pain, but Melendez's "long-sleeved shirt prevented the burn" from the Taser. Melendez grabbed the Taser away from Fenderson and threw it away from him. As the situation continued to escalate, Ache ran back to his patrol car and retrieved his K9 dog, and with the K9's assistance, the officers subdued Fenderson and placed him under arrest. Melendez suffered injuries during the fight with Fenderson, including a bleeding lower lip, an injury to his forehead, and an injury to his left wrist. Photos of Melendez's injuries were admitted into evidence.

Video recordings of the traffic stop and arrest, taken from the officers' patrol-car dash cameras, were admitted into evidence. Although the recordings did not show the struggle between the officers and Fenderson because it happened off-screen, their voices could be heard on camera, and one of the officers could be heard yelling, "He's got a taser! He's got a taser! He's got a taser!" Another officer could be heard yelling, "Let go of the taser!"

Fenderson testified in his defense. Fenderson acknowledged that at the time of the traffic stop, he had an outstanding arrest warrant for a parole violation and was in possession of over 70 grams of cocaine. Fenderson testified that he "panicked" and "just ran" when the

3

officers asked him to exit the vehicle. When asked why he continued to struggle with the officers and resist arrest after he was taken to the ground, Fenderson testified, "I wasn't in the right frame of mind." He claimed that at the time of the traffic stop, he was suffering from "mental issues" and was taking medication for paranoia. Fenderson denied that he was "a violent person" and denied hitting, punching, or tasing Melendez. Fenderson also testified that he "didn't even know" that he had taken the taser and that he "[did not] even know what happened" during the struggle because he "wasn't in the right state of mind."

After hearing the evidence, the district court found Fenderson guilty of the charged offenses of taking a weapon from a peace officer and assault on a public servant. These appeals followed.

## STANDARD OF REVIEW

"When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017)). "This standard requires the appellate court to defer 'to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id*. (quoting *Jackson*, 443 U.S. at 319). "We may not re-weigh the evidence or substitute our judgment for that of the factfinder." *Id*. (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). "The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence." *Id*. at 733 (citing *Villa*, 514 S.W.3d at 232). Although factfinders "may not speculate

4

about the meaning of facts or evidence," they are permitted to "draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial." *Id.* (citing *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016); *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007)). "We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution." *Id.* (citing *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012)). This is because the factfinders are "the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony." *Id.* (citing *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010)). "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13).

**DISCUSSION**

**Taking a weapon from a peace officer**

As charged in this case, a person commits the offense of taking a weapon from a peace officer if he "intentionally or knowingly and with force takes . . . from a peace officer . . . the officer's . . . stun gun."[1] Tex. Penal Code § 38.14(b). In his first issue, Fenderson claims that the evidence is insufficient to show that he intentionally or knowingly and with force took the Taser from Officer Ache. Fenderson contends that the evidence shows merely that he "ended up with the Taser after it was dropped or came out of the officer's holster." He emphasizes that

---

[1] At the time of the alleged offense, the State also was required to prove that the person took the weapon "with the intention of harming the officer." *See* Act of May 22, 2019, 86th Leg., R.S., ch. 647, § 1, 2019 Tex. Gen. Laws ___, ___ (current version at Tex. Penal Code 38.14(b)). Fenderson does not challenge that element on appeal.

5

none of the officers testified that they saw Fenderson take the Taser. In Fenderson's view, "[t]hat [he] ended up with the weapon does not connote an intentional and knowing forceful taking of the Taser" from Ache.

However, Fenderson overlooks other evidence in the record that supports the district court's finding that Fenderson did more than merely "end up" with the Taser. It was undisputed that during the traffic stop, Fenderson ran from police officers, was taken to the ground, and then fought with the officers as they attempted to subdue and arrest him. It was during this fight that Fenderson obtained possession of the Taser. Although no officer observed Fenderson take the weapon, the district court nevertheless could have reasonably inferred from the evidence that Fenderson intentionally or knowingly and with force took it from Ache. Melendez testified that Fenderson was "actively striking" the officers during the fight, and Ache testified that Fenderson "kept pushing us off" him. Then, when Ache attempted to use the Taser to subdue Fenderson, "it got knocked out of his hand" by Fenderson. Ache wrote in his offense report that Fenderson "swung his arm and hit the Taser out of [his] hands." Shortly thereafter, Fenderson had possession of the Taser and used it on Melendez. The district court could have reasonably inferred from this evidence that Fenderson took the Taser from Ache with force by swinging his arm at him and hitting or knocking the Taser out of Ache's hands. *See Dobbs v. State*, 434 S.W.3d 166, 171 (Tex. Crim. App. 2014) (defining "force" as "violence, compulsion, or constraint exerted upon or against a person or thing" (citing Merriam–Webster's Collegiate Dictionary 455 (10th ed. 1996))); *see also Olivarez v. State*, No. 07-09-00223-CR, 2010 WL 2756917, *6 (Tex. App.—Amarillo July 13, 2010, no pet.) (mem. op., not designated for publication) (concluding under similar facts that evidence was sufficient to prove that defendant took officer's stun gun "with force"); *Rico v. State*, Nos. 13-08-257-CR, -258-CR, 2009 WL

6

1623343, at *9 (Tex. App.—Corpus Christi-Edinburg June 11, 2009, pet. ref'd) (mem. op., not designated for publication) (defining "take" as to "get into one's hands or into one's possession, power, or control by force or stratagem"; "to lay or get a hold of with arms, hands, or fingers"; or "to seize or capture physically" (citing Webster's Third Int'l Dictionary 2329–30 (1981)).

In arguing that the evidence was insufficient to prove that he took the officer's Taser with force, Fenderson cites to *Hernandez v. State*, 903 S.W.2d 109 (Tex. App.—Fort Worth 1995, pet. ref'd), *Chadwick v. State*, 277 S.W.3d 99, 107 (Tex. App.—Austin 2009), *aff'd*, 309 S.W.3d 558 (Tex. Crim. App. 2010), and *Pryor v. State*, Nos. 05-03-00794-CR, -00795-CR, 2004 WL 728867 (Tex. App.—Dallas Apr. 6, 2004, pet. ref'd) (not designated for publication). However, these cases do not support Fenderson's position. In *Hernandez*, the indictment contained a "descriptive averment" that the defendant took the weapon specifically "by grabbing the officer's holstered firearm and attempting to remove it from the holster." 903 S.W.2d at 113. The court concluded that the State was required to prove the averment, even though it was not an element of the offense, and that the State failed to do so. *Id*. at 113–15. As a result, the court concluded that the evidence was insufficient to support the conviction. *Id*. The indictment in this case contained no such descriptive averment, but even if it did, the Court of Criminal Appeals has since held that the State is not required to prove immaterial "surplusage" contained in the indictment. *See Gollihar v. State*, 46 S.W.3d 243, 256–57 (Tex. Crim. App. 2001).

In *Chadwick*, the defendant was charged with attempting to take a weapon from a peace officer. 277 S.W.3d at 101. The defendant had assaulted an officer, and during the assault, the defendant used his hands, which were handcuffed together, to "pull up" on the officer's gun, which was snapped into the officer's holster. *Id*. at 102. The defendant did not remove the gun from the officer's holster. *Id*. On appeal, the defendant argued that the evidence

7

was insufficient to prove that he committed any act that amounted to "more than mere preparation" to take the weapon. *Id*. at 106. This Court disagreed, holding "that pulling on the gun, an act that would tend to dislodge the weapon and thus allow Chadwick to take possession and control of it, constitutes attempt to take the weapon." *Id*. at 107. Thus, *Chadwick*, although distinguishable from this case because it involved an attempt offense, is closer to the State's position. Here, Fenderson committed an act that would tend to (and in fact did) dislodge the weapon—he swung his arms at Ache and knocked the officer's Taser out of his hands, thus allowing Fenderson to take possession and control of it.

Similarly, in *Pryor*, the defendant was charged with attempting to take an officer's firearm. 2004 WL 728867, at *1. During an investigatory detention, the defendant ran away from police officers, and when the officers caught up to him, the defendant fought with one of the officers who was holding a firearm and attempted to point the gun in the officer's direction. *Id*. at *3. On appeal, the defendant argued that the evidence showed only that he "attempted to control the officer's gun hand" and that the evidence was insufficient to prove that he tried to remove the gun from the officer's possession. *Id*. The court disagreed, concluding that "the term 'take' does not require exclusive possession; rather, it means to get into one's hands or possession, power, or control." *Id*. The evidence showed that the defendant attempted to "control" or "get a hold" of the officer's firearm, and the court held that such evidence was sufficient to support the conviction. *Id*. There were similar facts in this case. Fenderson ran from police officers and was resisting arrest when he fought with the officers, and the district court could have reasonably inferred that Fenderson knocked the Taser out of Ache's hands so that Fenderson could "control" or "get a hold" of the weapon and use it against the officers in his efforts to resist arrest, which he did.

Finally, to the extent that Fenderson is further arguing that his taking of the weapon was not "intentional or knowing," a defendant's "mental culpability generally must be inferred from the circumstances under which the prohibited act or omission occurs," and a factfinder may "infer the defendant's requisite intent . . . from any facts tending to prove its existence, including . . . the defendant's acts, words, and conduct." *Harmel v. State*, 597 S.W.3d 943, 954 (Tex. App.—Austin 2020, no pet.). Here, the circumstances under which Fenderson obtained the Taser included that he gained possession of it while fighting the officers and resisting arrest, that he swung his arms at the officer who was holding the Taser and succeeded in knocking it out of his hands, and that when he obtained the Taser, rather than letting it go as one of the officers instructed him to do, Fenderson pulled the trigger and used it on Officer Melendez, who had to grab the Taser away from Fenderson. These circumstances support the district court's finding that Fenderson "intentionally or knowingly" took the Taser from Ache. *See Olivarez*, 2010 WL 2756917, at *6 (concluding that defendant's use of Taser and his efforts to resist arrest and maintain control of Taser despite being instructed by officer to put it down supported finding that defendant had intent to take Taser). On this record, we conclude that the evidence is sufficient to prove that Fenderson committed the offense of taking a weapon from a peace officer.

We overrule Fenderson's first issue.

**Assault on a public servant**

In the assault case, the State charged Fenderson with intentionally, knowingly, or recklessly causing bodily injury to Melendez by striking or pushing or stunning him. In his second issue, Fenderson asserts that the evidence is insufficient to prove that his conduct was either "intentional, knowing, or reckless." Fenderson claims that the evidence shows only that

9

he "suffered a mental breakdown when confronted with arrest, and his irrational conduct which followed was the result of an irrational mental process that prevented his formation of the requisite intent."

Because the State charged Fenderson with "intentionally, knowingly, or recklessly" assaulting Melendez, proof of any one of those culpable mental states will suffice to support the conviction. *See Guevara v. State*, 152 S.W.3d 45, 52 (Tex. Crim. App. 2004). Thus, the evidence is sufficient if it shows that Fenderson: (1) had the "conscious objective or desire" to cause Melendez bodily injury, *see* Tex. Penal Code § 6.03(a) (defining intentional conduct); (2) was "aware that his conduct [was] reasonably certain" to cause Melendez bodily injury, *see id*. § 6.03(b) (defining knowing conduct); or was "aware of but consciously disregarded a substantial and unjustifiable risk" that his conduct would cause Melendez bodily injury, *see id*. § 6.03(c) (defining reckless conduct). "Absent a judicial confession, the requisite culpable mental state must ordinarily be inferred from the acts of the accused or the surrounding circumstances." *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984).

Here, the evidence showed that Fenderson struck Melendez on at least three occasions during the incident—first when he initially ran away from the vehicle and pushed past Melendez, then when he hit Melendez on the head during the fight, and again when he used the Taser on Melendez. The evidence also showed that Melendez suffered pain and visible injuries as a result of Fenderson's conduct. Based on this evidence, the district court could have reasonably inferred that at the very least, Fenderson was aware of but consciously disregarded a substantial and unjustifiable risk that his conduct would cause Melendez bodily injury. *See, e.g.*, *Lofton v. State*, 45 S.W.3d 649, 652 (Tex. Crim. App. 2001) ("Even if appellant had intended only to prevent his arrest, the force used by appellant against [the officer], at the very least,

10

recklessly caused [the officer] to suffer a bodily injury."); *Griffis v. State*, 441 S.W.3d 599, 604–05 (Tex. App.—San Antonio 2014, pet. ref'd) (concluding that evidence was sufficient to establish that defendant intentionally, knowingly, or recklessly caused bodily injury to officer who was attempting to arrest him; "whether [the defendant]'s actions were a result of his resisting, as opposed to a violent attack on the officers, is . . . irrelevant."); *Johnson v. State*, 172 S.W.3d 6, 11–12 (Tex. App.—Austin 2005, pet. ref'd) (concluding that evidence was sufficient to support finding that defendant "at least acted with the requisite culpable mental state of recklessness" when she caused bodily injury to officers while resisting their attempts to restrain her).

As for Fenderson's argument that his "mental breakdown" prevented him from forming the requisite intent to assault Melendez, "Texas law, like that of all American jurisdictions, presumes that a criminal defendant is sane and that he intends the natural consequences of his acts." *Ruffin v. State*, 270 S.W.3d 586, 591 (Tex. Crim. App. 2008). However, Texas law "excuses a defendant from criminal responsibility if he proves, by a preponderance of the evidence, the affirmative defense of insanity." *Id.* at 591–92. "Insanity is the only 'diminished responsibility' or 'diminished capacity' defense to criminal responsibility in Texas." *Id.* at 592. Fenderson did not argue at trial, nor does he contend on appeal, that he was "insane" at the time he assaulted Melendez. He contends only that he suffered from a mental illness that prevented him from acting "rationally" at the time. "There is simply no defense recognized by Texas law stating that, due to the defendant's mental illness, he did not have the requisite *mens rea* at the time of the offense because he does not have the capacity, or is absolutely incapable of ever forming that frame of mind." *Jackson v. State*, 160 S.W.3d 568, 575 (Tex. Crim. App. 2005). Such evidence "may be relevant for mitigation purposes during the

11

punishment phase" of trial, *see Mays v. State*, 318 S.W.3d 368, 381 (Tex. Crim. App. 2010), but it does not negate Fenderson's *mens rea* to commit the offense, *see Jackson*, 160 S.W.3d at 574–75.

We overrule Fenderson's second issue.

**Modification of judgment**

The judgment of conviction for the offense of assault on a public servant states that the offense was a third-degree felony. However, the offense as charged was a second-degree felony. *See* Tex. Penal Code § 22.01(b-2). Moreover, the judgment lists the "statute for offense" as "22.01(b)(1) Texas Penal Code" when it should list "22.01(b-2) Texas Penal Code." This Court has authority to modify incorrect judgments when the necessary information is available to do so. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Owens v. State*, 549 S.W.3d 735, 745–46 (Tex. App.—Austin 2017, pet. ref'd). Accordingly, we modify the judgment of conviction for assault on a public servant to reflect that the offense was a second-degree felony and that the "statute for offense" is "22.01(b-2) Texas Penal Code."

## CONCLUSION

We affirm the district court's judgment of conviction for the offense of taking a weapon from a peace officer. We modify the judgment of conviction for assault on a public servant to reflect that the offense was a second-degree felony and that the "statute for offense" is "22.01(b-2) Texas Penal Code." As modified, we affirm the judgment of conviction.

_____
Gisela D. Triana, Justice

12

Before Justices Goodwin, Triana, and Smith

No. 03-20-00161-CR

Affirmed

No. 03-20-00162-CR

Modified and, as Modified, Affirmed

Filed:   June 3, 2021

Do Not Publish